Filed 11/15/22  Thompson v. Ito CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NANCY THOMPSON, | |
| Plaintiff and Respondent, | G059403 |
| v. | (Super. Ct. No. 30-2018-01027543) |
| THOMAS YOSHIO ITO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, David L. Belz, Judge.  Affirmed as modified.  Appellant's request for judicial notice.  Denied.  Appellant's motion to augment record.  Granted in part and denied in part.

Thomas Yoshio Ito, in pro. per., for Defendant and Appellant.

Albertson & Davidson, Stewart R. Albertson, Jeffrey M. Hall, Michelle P. Nguyen, and Omid J. Afait for Plaintiff and Respondent.

The trial court found Thomas Yoshio Ito committed financial elder abuse and used undue influence in causing his mother, Yoko Itow, to sign a trust naming Thomas as the sole primary beneficiary.[1] The court therefore deemed the trust to be invalid and unenforceable.

On appeal, Thomas raises numerous challenges to the judgment. We agree with Thomas the trial court erred by ordering Nancy Itow Thompson be appointed as executor of Yoko's estate, as the trial court never had jurisdiction of that issue. We will modify the judgment to remove that order.

We find no merit in any of Thomas's other arguments, and affirm the judgment as modified.


STATEMENT OF FACTS

Yoko and Robert Itow had two children — Thomas and Nancy. In May 1999, Yoko executed a will leaving her entire estate to her husband, if he survived her, and to Thomas and Nancy in equal shares if he did not.

Until 2008, Yoko and Nancy lived about one mile from each other and visited several times a month. Nancy and her family moved to Hawaii in 2008. Between January 2008 and December 2013, Yoko and Nancy spoke by telephone several times per month, and Yoko regularly mailed holiday and birthday cards with monetary gifts to Nancy and Nancy's sons.

In 2010, Yoko designated Thomas as her attorney-in-fact under a General Durable Power of Attorney and agent for healthcare decisions under an Advanced

---

[1] We will refer to the parties by their first names to avoid confusion. The trust at issue in this case is the Itow Family Trust. In various places in the appellate record, trustor Yoko Itow's last name is spelled Ito. Throughout this opinion, when necessary to mention the individual's last names, we use the spelling of that person's name that predominates in the appellate record.

Healthcare Directive.  In August 2014, Thomas filed for Chapter 7 bankruptcy.  One month later, Thomas and his family moved into Yoko's house on Scenic Bay Lane.

In 2016, Yoko's driver's license was suspended, and she became increasingly reliant on Thomas.  Thomas frequently drove Yoko to doctor's appointments and communicated details of Yoko's injuries, complaints, and condition to her doctors.  Thomas handled Yoko's medications, and retrieved her prescriptions from the pharmacy.  Thomas also drove Yoko to the market to buy food, and testified at his deposition he knew of no other way for Yoko to obtain food after her driver's license was suspended.  Yoko's care provider stated Thomas bathed Yoko, although he denied it.

After Thomas moved into Yoko's home in 2014, Nancy's telephone calls with Yoko decreased to one or two per year.  Nancy left messages every week, but rarely received return calls.  The transcript of a voicemail message from Yoko to Nancy during this time which was played at the trial reads:  "Ah, anyway, I have a hard time calling you, you know, because your brother gets mad.  Anyway, Nancy, I'll call you again, okay.  Bye."  Yoko was afraid to contact Nancy because of Thomas's anger.  Yoko also stopped sending birthday and holiday cards.  When they did speak, Nancy sensed Yoko was emotionally reserved and scared to speak in Thomas's presence, and Thomas interrupted Nancy and Yoko's conversations.  In April 2016, Nancy bought Yoko a personal phone so they could contact each other, but it broke a few months later.

In March 2016, Nancy flew from Hawaii to San Diego, California, and then drove with her husband and her son Joshua to visit Yoko and Robert.  Yoko was shocked and scared when they arrived because "'Tommy doesn't like that.'"  Thomas arrived during the visit, seemed angry, and screamed at and insulted Nancy.  In December 2016, Nancy's other son, Matthew, drove from Northern California to introduce Yoko to his fiancé.  Thomas refused to let them in.

Yoko's personal physician testified that between 2013 and 2018 he had treated Yoko for chronic anemia, kidney disease, diastolic heart failure,

3

emphysema/COPD, neuropathy, depression, and ulcers on her foot that turned into a necrotizing wound. The doctor prescribed antidepressants, cholesterol medication, heart medication, muscle relaxants, and pain medication for Yoko. Eventually, Yoko developed an opioid dependency. Yoko had difficulty walking, and suffered multiple falls due to lack of balance, resulting in broken bones and dislocated joints.

When Robert passed away on October 13, 2016, Thomas did not call Nancy to let her know because he did not think she cared. After Robert's death, Yoko became reclusive, more introverted, and less talkative. Thomas and his family were the people with whom she had her primary interaction.

In August 2017, Thomas scheduled, drove Yoko to, and sat in on an initial meeting with attorney Stuart Wallach to prepare new estate planning documents for Yoko. Thomas exchanged e-mails and telephone calls with Wallach and his staff regarding Yoko's estate plan. Specifically, Thomas communicated to Wallach that Yoko wanted Nancy removed as a beneficiary from the trust. Yoko never personally communicated her alleged intention to disinherit Nancy to Wallach.

On November 22, 2017, Thomas drove Yoko to Wallach's office, but waited outside the room while she signed her new estate planning documents. The Itow Family Trust (the Trust) provided that on Yoko's death, 100 percent of the trust assets were to be distributed to Thomas, and if Thomas should predecease her, 100 percent of the trust assets were to be distributed to Thomas's wife Sylvia. Thomas was named as the successor trustee to Yoko, with Sylvia named as second successor, and Nancy named as third successor.

In addition to the Trust, Yoko signed a pourover will, an affidavit of the death of the joint tenant of the Scenic Bay house, and a quitclaim deed transferring the Scenic Bay house to the Trust. The will devised the entirety of Yoko's estate to the Trust, and named Thomas as the executor and Sylvia as the executor if Thomas was unable or unwilling to serve.

4

On July 14, 2018, Yoko died at the age of 80. Shortly after her death, Thomas seized control of the bank accounts in Yoko and Robert's names. These accounts were not a part of the Trust at the time of Yoko's death, and Thomas obtained the assets contained in them through the use of Probate Code section 13100 declarations.

An applied behavioral analyst who worked with Thomas's son testified she or a member of her staff worked in the house with Thomas's son several hours a week, and all were mandated reporters. The analyst further testified no one on her staff had reported anything negative about Thomas. The analyst had personally observed Thomas interacting with Yoko, and had never seen him yell or become angry at her.

PROCEDURAL HISTORY

In October 2018, Nancy filed a petition for an order invalidating the Trust based on undue influence, and for damages against Thomas for financial elder abuse.[2] The court conducted a four-day bench trial in January 2020, and issued a detailed 21-page statement of decision in March 2020. Relevant to this appeal are the trial court's findings regarding Thomas's lack of credibility as a witness:

"The court found the testimony of Thomas Itow to lack credibility. Mr. Itow was not confident in his responses to questions. Mr. Itow contradicted himself in his deposition testimony and in his trial testimony. Cases for undue influence and elder abuse often are determined by the credibility of the witnesses. This was one of those cases where the court's review of the testimony revealed credibility gaps in Thomas Itow's testimony." No party filed objections or requests for clarification regarding the statement of decision.

The court entered a final judgment in June 2020. In the judgment, the trial court made the following factual findings that are relevant to the issues on appeal:

---

[2] Nancy's claim the Trust was the product of lack of capacity was dismissed before trial.

5

"1.  At all times mentioned herein, Yoko Itow was an elder and dependent adult as defined in Welfare and Institutions Code Section 15610.27.

"2.  With Regard to Undue Influence.  The Court finds that the November 22, 2017 Itow Family Trust was executed by Yoko Itow as the result of excessive persuasion and as the result of undue influence as defined in Welfare and Institutions Code 15610.70.  Therefore, the Trust is deemed to be invalid and unenforceable.  The Court further finds that Yoko Itow was vulnerable to undue influence due to her age, due to her health issues and due to her being isolated from other family members.  The Court finds that Thomas Itow exercised apparent authority over Yoko Itow as a family member and care provider by providing Yoko with companionship and affection and as a fiduciary carrying her Durable Power of Attorney.  The Court finds that Thomas controlled the interactions of Yoko with other family members.  The Court finds that Yoko Itow was unduly influenced and persuaded to change her estate plan documents by disinheriting her daughter Nancy Itow.  The Court arrived at these findings after hearing all of the evidence presented in this case and the circumstances of the family dynamics and history of isolation, control and conflict.  The Court further finds there was inequity in the result because Nancy Thompson was disinherited by and through the November 22, 2017 Itow Family Trust.

"3.  The Court invalidates the Quitclaim Deed recorded on July 18, 2018 in the Orange County Recorder's Office as Document number 2018-000261635.

"4.  The Court orders the return of the real property at 19842 Scenic Bay Lane, Huntington Beach, CA 92648 to Yoko Itow in her individual capacity and confirming that this real property be administered under Yoko Itow's estate.

"5.  The Court orders the November 22, 2017 Itow Family Trust invalidated.

"6.  The Court orders Nancy Itow to be appointed as Executor for the Estate of Yoko Itow.

"7. The Court finds that the allegations of financial elder abuse pursuant to Welfare & Institutions Code Section 15610.30 were proven by a preponderance of the evidence and grants the Petition for findings of financial elder abuse. The Court further finds that Thomas committed acts of financial elder abuse by taking and obtaining real or personal property of Yoko by undue influence and for a wrongful use and that such taking and obtaining was harmful to Yoko as it deprived Yoko of her property right to properly dispose of her earthly estate. At the time of the taking, Thomas knew or reasonably should have known the conduct was likely to be harmful to Yoko Itow.

[¶] . . . [¶]

"10. As to the request for attorney fees & costs made by Nancy in accordance with Welfare and Institutions Code Section 15657.5 for financial elder abuse, the Court grants this request as Nancy has shown by a preponderance of the evidence that Thomas committed acts of financial elder abuse pursuant to Welfare and Institutions Code Section 15610.30(a)(1) & (3). The Court grants the request for attorney fees and costs as provided for in Welfare and Institutions Code Section 15657.5. The Court reserves on findings as to the amount of attorney fees and costs."

Thomas appealed from the judgment.

DISCUSSION

I.

SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDING OF
UNDUE INFLUENCE TO INVALIDATE THE TRUST

The trial court found the Trust was the product of undue influence by Thomas, and therefore set it aside. Welfare and Institutions Code section 15610.70 defines undue influence as "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (*Id.*, subd. (a).) To determine whether an act or omission was the product of undue influence,

7

the court must consider (1) the victim's vulnerability, (2) the apparent authority of the influencer, (3) the influencer's actions or tactics, and (4) the equity of the result. (*Ibid.*) Probate Code section 86 incorporates this definition of undue influence.

Nancy was required to establish undue influence by clear and convincing evidence. (*Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 545.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

The trial court's finding that Yoko was vulnerable was amply supported by substantial evidence. At the time Yoko executed the Trust, she was 79 years of age and had numerous health issues, including a history of depression for which she was taking medication since 2013, a fractured right shoulder due to a fall in 2015, a fractured arm due to a fall in 2017, and a dislocated right shoulder in October 2017. She was suffering from chronic obstructive pulmonary disease, vascular disease, aortic calcification, and anemia. Yoko was taking Norco as a pain reliever, as well as antidepressants and muscle relaxers. After losing her driving privileges, she was reliant on Thomas for "necessities of life," including groceries, medications, and basic daily activities such as bathing.

The trial court also found Thomas had apparent authority over Yoko because he held a general power of attorney to act on her behalf as a fiduciary and legal agent. Additionally, Thomas and his family had moved into Yoko's house in 2014 and lived with her until her death.

As to actions by the influencer, Thomas, the trial court relied on testimony that Nancy's close relationship with Yoko declined after Thomas moved in with Yoko. Thomas controlled and limited Nancy's communications with Yoko and limited Yoko's interactions with other members of the family. In particular, the court relied on a voice mail message from Yoko to Nancy, quoted *ante*. The court found all of this to be "evidence of tactics of isolation, dependency and intimidation."

As to the inequity of the changes to Yoko's estate plan, "there was no evidence that Yoko knew or understood the nature of the changes to the estate plan that she executed on November 22, 2017." The attorney preparing the documents, Wallach, had no recollection of meeting with Yoko. Thomas initiated the calls with Wallach's office, transported Yoko to her meetings with Wallach, and communicated to Wallach's office on Yoko's behalf. Most importantly, Thomas advised Wallach of Yoko's alleged request to make Thomas the Trust's sole beneficiary after Yoko's death, and cut out Nancy completely, although Yoko's previous estate plan had left her assets evenly to Thomas and Nancy. Many of the cases Thomas cites find a lack of undue influence where the party merely transported the decedent to the attorney's office or set up meetings with the attorney. Thomas's admitted involvement in providing the direction to disinherit Nancy to the attorney, with no evidence Yoko was even aware of this change, distinguishes the present case. Substantial evidence supported the trial court's finding the Trust was the product of Thomas's undue influence.

II.

SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDINGS OF FINANCIAL ELDER ABUSE

Financial elder abuse must be proven by a preponderance of the evidence. (Welf. & Inst. Code, § 15657.5, subd. (a); *Das v. Bank of America, N.A.* (2010) 186 Cal.App.4th 727, 735, fn. 5.) We review the trial court's findings for substantial evidence. (*Keading v. Keading* (2021) 60 Cal.App.5th 1115, 1125.)

9

As relevant to this case, financial elder abuse occurs when a person takes or obtains property from an elder for a wrongful use, with intent to defraud, or by undue influence. (Welf. & Inst. Code, § 15610.30, subd. (a)(1), (3).) If the person takes or obtains the property and knows or should have known that to do so would be harmful to the elder, wrongful use is presumed. (Welf. & Inst. Code, § 15610.30, subd. (b); *Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 866.)

The trial court found Thomas took or obtained property from Yoko by causing the Scenic Bay house to be transferred to the Trust, in which Thomas received a 100 percent interest. Because the prior estate plan gave all property to Thomas and Nancy 50/50, the new plan deprived Yoko of the right to determine to whom the property would pass. "The right to acquire, own, enjoy and dispose of property is . . . a basic fundamental right guaranteed by the Fourteenth Amendment to the United States Constitution." (*People v. Beach* (1983) 147 Cal.App.3d 612, 622.) Depriving an individual of the ability to determine to whom their property should pass after their death by the use of undue influence is therefore a taking for purposes of financial elder abuse. (See *Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 472; *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1350-1351 (*Lintz*).) Substantial evidence supported the trial court's finding Thomas committed financial elder abuse.

III.

### THE TRIAL COURT'S REFERENCE TO YOKO AS A DEPENDENT ADULT WAS NOT PREJUDICIAL

Thomas argues that because the trial court referred to Yoko as a dependent adult and as an elder in the judgment, substantial prejudice resulted throughout the final

10

decision.[3] Given their definitions, one cannot be a member of both groups at the same time. At all relevant times, Yoko was an elder, not a dependent adult. However, dependent adults and elders are treated the same for purposes of determining whether financial abuse occurred (Welf. & Inst. Code, § 15610.30) and whether the defendant should be required to pay attorney fees due to their acts of financial abuse (*id.*, § 15657.5). Further, in the judgment the trial court cited Welfare and Institutions Code section 15610.27, which defines the term elder. Therefore, despite the trial court's error in referring to Yoko as a dependent adult as well as an elder, no prejudice occurred.

IV.

THE TRIAL COURT DID NOT RELY ON THE REBUTTABLE PRESUMPTION OF UNDUE INFLUENCE IN PROBATE CODE SECTION 21380

Thomas argues the presumption that a trust instrument making a donative transfer to a care custodian is the product of undue influence should not apply in this case. Probate Code section 21380 creates a rebuttable presumption that a donative transfer is the product of fraud or undue influence when made to certain persons. Probate Code section 21382 creates certain exceptions to section 21380. In *Rice v. Clark* (2002) 28 Cal.4th 89, 91-92, the court, interpreting a predecessor statute, held a person "who provides information needed in the instrument's preparation and who encourages the donor to execute it, but who does not direct or otherwise participate in the instrument's transcription to final written form" does not cause an instrument to be transcribed, and is

_____

[3] As defined in the Welfare and Institutions Code, "elder" and "dependent adult" are distinct types of protected persons. "'Dependent adult' means a person, regardless of whether the person lives independently, between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities, or whose physical or mental abilities have diminished because of age . . . [and] includes any person between the ages of 18 and 64 years who is admitted as an inpatient to a 24-hour health facility . . . ." (Welf. & Inst. Code, § 15610.23, subds. (a), (b).) "'Elder' means any person residing in this state, 65 years of age or older." (Welf. & Inst. Code, § 15610.27.)

11

therefore not presumptively disqualified under the predecessor statute to Probate Code section 21380. Thomas argues that because he did not participate directly in transcribing the Trust and other documents, the rebuttable presumption of undue influence should not have applied.

However, the trial court did not rely on the rebuttable presumption of Probate Code section 21380 in finding Thomas acted with undue influence over Yoko. Instead, the court found clear and convincing evidence proving each element of undue influence under Welfare and Institutions Code section 15610.30.

## V.

### THE TRIAL COURT DID NOT IMPROPERLY RELY ON *LINTZ*

Thomas challenges the judgment on the ground the trial court improperly relied on *Lintz, supra*, 222 Cal.App.4th 1346. Probate Code section 21385 was enacted to supersede *Lintz*'s holding regarding the presumption of undue influence in property-related transactions between spouses. (*Lintz, supra,* 222 Cal.App.4th at pp. 1353-1354; see Stats. 2019, ch. 43, § 2.)

The trial court cited *Lintz, supra*, 222 Cal.App.4th 1346 only for the unassailable proposition that "[t]he court determines issue[s] of undue influence by inferences drawn from all the facts and circumstances." *Estate of Garibaldi* (1961) 57 Cal.2d 108, 113, cited by Thomas in his opening appellate brief, states the same, as do numerous other opinions. For the point on which the trial court cited it, *Lintz* is still good law; the trial court did not err in relying on it.

## VI.

### THOMAS'S ACTIVITIES IN OBTAINING THE TRUST AND RELATED DOCUMENTS WERE MORE THAN "INCIDENTAL"

Thomas next argues the trial court erred by determining his incidental activities were tantamount to active participation in using undue influence over Yoko. Thomas initially contacted Wallach's office, scheduled Yoko's first appointment, and

12

drove Yoko to and attended her first meeting with Wallach. There was no evidence Yoko ever communicated directly with Wallach; to the contrary, Thomas made all telephone calls and exchanged all e-mails with Wallach's office. Most significantly, Thomas admitted he communicated to Wallach Yoko's alleged request Nancy be disinherited, and Thomas receive 100 percent of the estate. There was no evidence Yoko understood the change in beneficiaries from her earlier will, in which her estate would be divided 50/50. The trial court could properly find this to be clear and convincing evidence proving Thomas's role in obtaining the Trust was more than incidental.

The cases Thomas cites in support of this argument are distinguishable. First, in all the cases Thomas cites, the courts applied a presumption of undue influence, which was not the case here. Second, the activities of the individuals being charged with undue influence in those cases were significantly less than Thomas's activities.

In *Estate of Lombardi* (1954) 128 Cal.App.2d 606, 613, the testatrix called the attorney and provided data for her will to be drawn up. Although the daughter drove the testatrix to the attorney's office and was present when the will was signed, she did not participate in the conversation regarding the will or try to encourage her mother to sign or not sign the will.

In both *Estate of Mann* (1986) 184 Cal.App.3d 593, 608, and *Estate of Bould* (1955) 135 Cal.App.2d 260, 275-276, the courts held none of the following brings the presumption of undue influence into play: procuring an attorney to prepare the will; selecting an attorney and accompanying the testator to the attorney's office; presence in the attorney's outer office; presence at the will's execution; or presence during both the giving of instructions for the will and at its execution.

In *Rice v. Clark, supra*, 28 Cal.4th at page 92, the court held "a person who provides information needed in the instrument's preparation and who encourages the donor to execute it, but who does not direct or otherwise participate in the instrument's transcription to final written form" did not cause the instrument to be transcribed,

13

pursuant to Probate Code former section 21350, and was therefore not presumptively disqualified from taking under that instrument. The individual in *Rice v. Clark, supra*, 28 Cal.4th at page 105, gave the attorney a list of the decedent's assets, arranged appointments with the attorney and drove the decedent to those appointments, urged the attorney's secretary to prepare the documents promptly, and encouraged the decedent to sign them; the court held he did not "'cause'" the instruments to be transcribed. Thomas's direction to attorney Wallach that 100 percent of the trust assets should pass to himself distinguishes the present case from *Estate of Mann, Estate of Bould,* and *Rice v. Clark.*

Thomas also contends Nancy failed to prove Yoko lacked capacity to execute the Trust. However, Nancy dismissed her claim for invalidation of the Trust based on lack of capacity, and the trial court made no findings regarding Yoko's capacity.

VII.

THE ISSUE OF UNNATURAL DISPOSITION IS IRRELEVANT IN THIS CASE

Thomas next argues the judgment should be reversed because naming Thomas as the sole beneficiary of the Trust was not an unnatural disposition of Yoko's estate. While the cases Thomas cites for this argument hold it is not unnatural for a person to devise all or a significant portion of their estate to a nonrelative with whom they have a close bond rather than to a relative, or to give more to one relative than another, the evidence in those cases also established no undue influence had been exercised by the person receiving the estate. (*Estate of Fritschi* (1963) 60 Cal.2d 367, 373-374; *Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604; *Estate of Wright* (1963) 219 Cal.App.2d 164, 169-170; *Estate of Locknane* (1962) 208 Cal.App.2d 505, 515; *Estate of Jacobs* (1938) 24 Cal.App.2d 649, 652; see *Estate of Bould, supra*, 135 Cal.App.2d at p. 272 [confidential relationship not enough to prove undue influence where there is no evidence of activity in preparation of will].)

14

The trial court's judgment does not deny Yoko the right to dispose of her property as she saw fit. To the contrary, the trial court impliedly found her testamentary intent had been overcome by Thomas's undue influence. Substantial evidence supports that finding.

## VIII.

### LOSS OF A PROPERTY RIGHT BY YOKO WAS ESTABLISHED

To prevail on a claim of financial elder abuse, the plaintiff must prove the defendant deprived the elder of "any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder." (Welf. & Inst. Code, § 15610.30, subd. (c).) Thomas argues that because the Trust did not deprive Yoko of the use of her property during her lifetime, he did not commit a taking of her property.

Depriving a person of an intended post-death distribution of property constitutes a taking for purposes of financial elder abuse. (See *Bounds v. Superior Court, supra*, 229 Cal.App.4th at p. 472; *Lintz, supra*, 222 Cal.App.4th at pp. 1350-1351.)[4]

## IX.

### THE TRIAL COURT DID NOT HAVE JURISDICTION TO APPOINT NANCY AS EXECUTOR

Thomas argues the trial court erred by ordering Nancy to be appointed as executor of Yoko's estate. Yoko's will names Thomas as executor and Sylvia, Thomas's wife, as successor executor.

The judgment does not invalidate the will that was signed by Yoko at the same time as the Trust. More importantly, the issues of Yoko's will, estate, and executor were never before the court in connection with Nancy's petition to invalidate the Trust. Nancy's petition did not seek an order prohibiting Thomas, much less Sylvia, from

---

[4] This is not the portion of the *Lintz* holding superseded by Probate Code section 21385.

15

serving as executor or from being appointed to that role. The trial court did not have jurisdiction to determine who should serve as the executor for Yoko's estate.

At oral argument, Nancy's counsel for the first time argued the trial court did not err by bypassing Sylvia and appointing Nancy as executor. First, Nancy argued Sylvia waived any claim to appointment because she did not timely file a petition to be named as executor, citing Probate Code sections 8001 and 8440. Probate Code section 8001 provides: "Unless good cause for delay is shown, if a person named in a will as executor fails to petition the court for administration of the estate within 30 days after the person has knowledge of the death of the decedent and that the person is named as executor, the person may be held to have waived the right to appointment as personal representative." First, there would be no reason for any proposed executor to file a petition for probate and appointment until after the trial court invalidated the declaration of trust. Second, Nancy herself did not file a petition for probate asking to be appointed as executor until July 2020, after the trial court entered its judgment on the trust petition and more than two years after Yoko's death.

Second, Nancy argued both Thomas and Sylvia are ineligible for appointment as executor under Probate Code sections 8402 and 8502. Probate Code section 8402 provides, in relevant part: "Notwithstanding any other provision of this chapter, a person is not competent to act as personal representative in any of the following circumstances: . . . There are grounds for removal of the person from office under Section 8502."

In turn, Probate Code section 8502 provides a properly designated executor or personal representative may be removed if "(a) The personal representative has wasted, embezzled, mismanaged, or committed a fraud on the estate, or is about to do so. [¶] (b) The personal representative is incapable of properly executing the duties of the office or is otherwise not qualified for appointment as personal representative. [¶] (c) The personal representative has wrongfully neglected the estate, or has long neglected

16

to perform any act as personal representative. [¶] (d) Removal is otherwise necessary for protection of the estate or interested persons. [¶] (e) Any other cause provided by statute."

While the trial court's findings about Thomas's involvement in the drafting and execution of the Trust may make him ineligible to serve as executor, no findings were made against Sylvia because the issue was not before the trial court. The judgment will be modified to remove this order only.[5]

## X.

### THOMAS'S MOTION TO AUGMENT AND REQUEST FOR JUDICIAL NOTICE

Thomas filed a motion to augment the record on appeal, and a request for judicial notice. Both were unopposed.

The motion to augment the appellate record with the documents attached to the motion as Exhibits 1, 2, 3, 6, 7, 8 and 9 is granted. (Cal. Rules of Court, rule 8.155(a)(1)(A).) The motion is denied as to the documents attached as Exhibits 4 and 5, as these documents are already a part of the appellate record. (See Clerk's Transcript pages 42-46, and 66.)

The request for judicial notice is denied. (Cal. Rules of Court, rule 8.252(a); Evid. Code, §§ 452, subd. (d)(1), 459.) The documents attached to the request are not relevant to the issues on appeal, and were filed after the judgment that is the subject of this appeal. (Cal. Rules of Court, rule 8.252(a)(2)(A) & (D).)

## DISPOSITION

The judgment is modified to delete the order appointing Nancy Itow Thompson as executor for the estate of Yoko Itow. In all other respects, the judgment is

---

[5] This opinion is not intended to take any position as to whom should be appointed executor of Yoko's estate.

17

affirmed.  Because both parties prevailed in part, in the interests of justice neither party shall recover costs on appeal.


MOTOIKE, J.

WE CONCUR:


GOETHALS, ACTING P. J.


SANCHEZ, J.